T. W. BARHYDT, Appellee, v. W. C. CROSS ET AL., Appellants.

**Taxation:** CANCELLATION OF ASSESSMENT: BURDEN OF PROOF. A taxpayer claiming that he was not possessed of property with which he was assessed is charged with the burden of proving that fact;

and in the absence of any evidence from him on the subject the court is not justified in cancelling the assessment on the ground that defendant offered no evidence that he had such property for taxation.

**Same:** OBJECTIONS TO ASSESSMENT: WAIVER. A taxpayer can not question on appeal the form of an assessment made by a board of review, where he failed to raise that question before the board.

**Same:** RESIDENCE: EVIDENCE. For the purpose of taxation a person must have a domicile or residence somewhere, and his old residence will be deemed his present one until a new one has been acquired. In the instant case the plaintiff and his wife lived continuously at one place in this state for many years, and while living there they left for a trip around the world, leaving the house furnished and in the possession of a caretaker. *Held,* that that was his place of residence for the purpose of taxation during his trip abroad, even though he may have intended removing to another state upon their return to this country, and in fact did purchase property and make their residence in such other state upon their return.

*Appeal from Des Moines District Court.*—HON. JAMES D. SMYTHE, Judge.

" THURSAY, JUNE 6, 1912.

APPEAL from a decree of the district court canceling an assessment against plaintiff, Barhydt, of $250,000 on moneys and credits for the year 1910.—*Reversed.*

*Poor & Poor,* for appellant.

*Blake & Wilson,* for appellee.

DEEMER, J.—The facts are not in dispute. We quote from appellant's brief such as are deemed controlling.

Prior to October 8, 1909, T. W. Barhydt resided at No. 420 Iowa street, in the city of Burlington, Iowa; the same being an eleven-room brick house, with brick laundry and barn, on a lot 180 x 117 feet, where he had lived con-

tinuously for over forty years. On October 8, 1909, while still living in that house, he and his wife started on a trip of travel, study, information, and sightseeing around the world via New York, the Suez Canal, Egypt, India, China, Japan, and Hawaii; the destination being San Francisco, Cal. He left his furnished home at Burlington in charge of a caretaker. After leaving New York, the only place where they were in territory controlled by the United States before reaching their destination was at Manila, Philippine Islands, on December 19, 20, and 21, 1909, and at Honolulu January 23 and 24, 1910. They reached San Francisco, Cal., on January 31, 1910, where their water trip ended; and, after resting a few days there, they went direct to Los Angeles and Pasadena, Los Angeles county, Cal., spending part of the time in each place, while Mr. Barhydt looked over different properties he had in view to purchase, first purchasing No. 90 South Grand avenue, Pasadena, late in March. At the same time, he had made an offer on No. 969 San Pasqual street, Pasadena, which was accepted within a few days, both of which properties he owns now. Mr. Barhydt remained in Pasadena until April 15th, when he and his wife returned to Burlington, and such portions of the summer as they were in that city occupied No. 420 Iowa street, their old home, and lived there until December 20, 1910. At the date of the trial below, March 7, 1911, his house and furniture in Burlington were in charge of a caretaker. Prior to this trip around the world, they were accustomed to spend most of their winters in Burlington, taking occasional trips, but never going away before February or March.

At the time of taking Mr. Barhydt's deposition (January 30, 1911), he was living at No. 969 San Pasqual street, Pasadena, Cal., having occupied that house since December 23, 1910, the house having been purchased in March, 1910; and Mr. Barhydt took possession of the same by placing a caretaker in charge of it on April 22,

1910. Mr. Barhydt testified that he left Iowa, with the purpose and intention of ceasing to have a residence and domicile there, on October 8, 1909. Previous to leaving Burlington, he said he looked up several places in California in view of becoming a resident and citizen of that state.

An assessment was made against Barhydt by the assessor for the year 1910 of two dogs, one horse, three vehicles, and household funiture amounting of $1,000, and on this assessment roll was a statement that Barhydt lived at Pasadena, Cal. And also the following statement: "I own twenty shares of Merch. Nat. Bank stock, and demand that my indebtedness be deducted from value of personal property." On this roll Barhydt also listed his debts, which he claimed amounted to $47,741. This roll was made out for Mr. Barhydt by his attorney, and was returned by the assessor to the board of review.

When the matter reached the board of review, it changed the assessment, as follows: "(11) Moneys and credits raised from nothing to $250,000. Household furniture raised from nothing to $2,000." The $2,000 is scratched out, and written below said $2,000 are the figures "$1,000"; such change being made in red ink.

Against this change the plaintiff filed the following protest with the board: "To the Board of Review of the City of Burlington, Iowa—Gentlemen: I, T. W. Barhydt, protest against the assessment made by this board of review reported as follows: 'Moneys and credits raised from nothing to $250,000. Household furniture raised from nothing to $2,000.' (1) This board is without legal jurisdiction or authority to make said assessment. (2) T. W. Barhydt is not a resident of the state of Iowa, and was not on the 1st day of January, 1910, nor at any time since October 8, 1909. (3) T. W. Barhydt, on January 1, 1910, had no moneys and credits taxable in this jurisdiction under the laws of the state of Iowa. (See affidavit attached.)

As to household furniture: (1) The return of Mr. Barhydt of household furniture at $1,000 is fair and equitable, and is the full value of his household furniture subject to taxation. (See affidavit attached.) Wherefore you are respectfully asked to cancel said proposed change."

This was supported by an affidavit of Barhydt made on the 22d day of April, 1910, in which he said:

I am not now, and I was not on the 1st day of January, 1910, nor at any time since said date, a resident of the state of Iowa; that I removed from the state of Iowa to the state of California, leaving Iowa on the 8th day of October, 1909, and at no time since said date have I been, nor am I now, a resident of the state of Iowa, but am a resident of the state of California. My removal from the state of Iowa was in good faith; and I have no purpose of again becoming a citizen or resident of Iowa. I further state that on the 1st day of January, 1910, I was not the owner of moneys and credits, subject to taxation in Iowa, aside from national bank stocks and savings bank stocks, said bank stocks all being taxable only at the place of the location of the bank, and all being paid by said banks; nor did I have in my possession, nor did I own, any moneys and credits in any sum issued by any Iowa corporation or other Iowa resident, or in any manner secured by Iowa property, save and except two mortgages, one for $3,000 and one for $1,000, and on said January 1, 1910, I was indebted, as stated in my original return, in excess of the sum of $47,000, more than one-half of which indebtedness was due and owing to Iowa creditors. As to household furniture, I have paid taxes on household furniture at a valuation of something like $1,000 for very many years. My taxable household furniture is very old and worn, and its taxable value does not exceed the sum which I returned, to wit, $1,000. And further deponent sayeth not.

This protest was unavailing, and plaintiff appealed to the district court, and upon trial there the assessment on moneys and credits in the sum of $250,000 was canceled. Plaintiff at that trial introduced no testimony showing, or tending to show, that he did not have the amount of moneys

and credits with which he was assessed. On the contrary, his testimony was directed wholly to the issue as to his residence on January 1, 1910.

The appeal for and on behalf of the defendants challenges the ruling of the trial court in canceling the assessment on moneys and credits. As no testimony was adduced by plaintiff showing that he was not possessed of the amount of moneys and credits with which he was assessed, the finding of the trial court can not be sustained on the theory that defendants offered no evidence that he had such property subject to taxation. *King v. Parker,* 73 Iowa, 757.

1. TAXATION: cancellation of assessment: burden of proof.

II. In support of the court ruling, it is contended that the assessment made by the board of review can not be sustained, because it was upon moneys and credits, without specification as to items. The exact point here is that the board acts simply as and for the assessor; and that, as it was the duty of the assessor to list the kind and character of items under the head of moneys and credits, as, notes, bonds, money in bank, book accounts, etc., so it was the duty of the board to do likewise; and that its assessment of "Moneys and credits raised from nothing to $250,000" is irregular and illegal, and should be set aside. The statute provides for such a listing by the assessor (see Code Supp., section 1360), with forms there given. But this seems to be largely for convenience, in order that it might be deducted from the net amount as brought forward onto the roll in another place. There is no provision of this kind with reference to the action of the board of review. Without passing upon the necessity for such a course, it is enough for the present to say that in making his protest before the board of review plaintiff made no such claim as is now insisted upon. We have fully set forth all the specifications contained in that protest; and none of them, as it seems to us, covers the matters now under consideration. That plaintiff is con-

2. SAME: objections to assessment: waiver.

fined to the objections there made is elementary.  *Brown v. Grand Junction,* 75 Iowa, 489; *Railway Co. v. Cedar Rapids,* 106 Iowa, 477; *Gibson v. Cooley,* 129 Iowa, 529; *Farmers' Bank v. Fonda,* 114 Iowa, 728.

By no stretch of the imagination can it be said that the question as to the validity of the schedule was made before the board.  It is quite important that such objection be made before the board, in order that it may make a correction at the time, and thus require of the taxpayer that he bear his just proportion of the burdens.  Unless so made, he should ever after hold his peace, and not be allowed to question the form of the assessment.

III.     But a single question is left, and that the primary one:  Was Barhydt domiciled at Burlington on January 1, 1910, or had he such a residence there as subjected his property to taxation in that district?

3. SAME:
   residence:
   evidence.

It is perfectly manifest that that was his home until he started on his trip around the world, and that he did not gain a residence or domicile at any other place until after the 1st of January, 1910.  Although on the ocean on January 1st, he had a residence or domicile somewhere; for he could not fully expatriate himself.  Had he died on his journey, or gone down with his ship, as so many brave men have recently done, there could be no question as to his domicile.  His will, if he had made one, would undoubtedly have been probated at Burlington; and his estate, if he left no will, would have been administered by the courts of this state, and in Des Moines county.  As Barhydt must have had a residence and domicile somewhere, it is for the courts to decide where that was, under the record now presented.  Residence and domicile have no uniform meaning in law; and when it becomes necessary to interpret them much depends upon the nature of the action.

Cases of abandonment of residence, as applied to homesteads, or as to residence, where it is not essential that

one have a homestead at all, or a definite residence, for the purposes of the case, are not applicable to such controversies as this, where a man must have a residence or domicile somewhere. Courts endeavor to construe revenue laws so that each one will share his just burden of taxation; and he should pay his taxes somewhere. Hence it is the universal rule, in construing revenue statutes, that, as a man must have a domicile or taxing residence somewhere, his old residence will be deemed his present one until a new one is acquired. If this were not the rule, a man might escape taxation altogether. Assuming, for the purposes of argument, as we must, that the laws of California are the same as our own, Barhydt would escape all taxation for the year 1910, were he successful in this appeal; for he could not, under the record, be taxed in California. Our own cases, with possibly one exception, sustain this view, and, as we shall see, this is the holding elsewhere. Of our own cases supporting the conclusion here reached, see *Tuttle v. Wood,* 115 Iowa, 509; *Glotfelty v. Brown,* 148 Iowa, 124; *In re Titterington,* 130 Iowa, 358; *Nugent v. Bates,* 51 Iowa, 79; *Cover v. Hatten,* 136 Iowa, 65.

In *Cover's* case, it is said:

Where one acquires a residence, that residence is presumed to continue until he acquires another; and the burden is upon him to show a change and the acquisition of a new residence. This change, for the purpose of taxation, must be something more than a mere intent. It involves a change of place as well. In other words, the mere intent of the plaintiff, no matter how expressed, will not constitute a change, unless there be a change in abode as well.

In *Titterington's* case, we said:

A man must have a domicile somewhere. He can not have two at the same time; and a domicile once gained remains until a new one is acquired. Two things must concur to effect a change of domicile. There must be actual residence and the intent.

In *Tuttle's* case, this was said:

The change (of domicile) can not be made except *facto et animo*. Both are alike necessary. Either, without the other, is insufficient. Mere absence from a fixed home, however long continued, can not work the change. There must be *animus* to change the prior domicile for another. Until the new one is acquired, the old one remains.

The other cases use like expressions; and the only discordant note is found in *Ludlow v. Szold,* 90 Iowa, 175, relied upon by appellee. That decision was by a divided court, however; and the question involved was not one of taxation. In so far as any of the language used is at variance with that used in the taxation cases since decided, and to which we have made reference, it must be regarded disapproved. For purposes of taxation, the word "residence," as used in our statutes, means "domicile." *Barber v. Farr,* 54 Iowa, 57; *Gilbertson v. Oliver,* 129 Iowa, 568; *Glotfelty v. Brown,* 148 Iowa, 124.

We make this reference for the purpose of showing the applicability of cases from other jurisdictions which support the rule we have adopted. Thus, in *Borland v. Boston,* 132 Mass. 89 (42 Am. Rep. 424): "One domiciled in Boston, Mass., went to Europe in 1876 with his family, for an indefinite term of absence, and remained abroad until 1879. On leaving, he had determined never to return to reside in Boston, and before May 1, 1877, he had decided to take up his residence, on his return, in Waterford, Conn.; and on his return he went there to reside. Held, that his 'domicile,' for the purposes of taxation, was in Boston on the 1st of May, 1877."

In the opinion, it is said:

Upon the whole, therefore, we can have no doubt that the word 'inhabitant,' as used in our statutes when referring to liability to taxation, by an overwhelming preponderance of authority, means 'one domiciled.' While there must be inherent difficulties in the decisiveness of proofs of domicile, the test itself is a certain one; and, inasmuch as every person, by universal accord, must have a domicile,

either of birth or acquired, and can have but one, in the present state of society, it would seem that not only would less wrong be done, but less inconvenience would be experienced, by making domicile the test of liability to taxation, than by the attempt to fix some other necessarily more doubtful criterion. . . . The plaintiff does not bring himself within this rule; for, although he might have left the commonwealth with the fixed purpose to abandon it as a residence, he did not leave it on his way to a place certain, which he had determined upon as his future residence, and was proceeding with due despatch; and upon the general rule that, having had a domicile in this commonwealth, he remains an inhabitant, for the purpose of taxation, until he has acquired a new domicile, the intention and fact had not concurred at the time when this tax was assessed.

See, also, *Bulkley v. Williamstown,* 3 Gray (Mass.) 493. The court there said:

The general rule, and, for practical purposes, a fixed rule, is that a man must have a habitation somewhere; he can have but one; and therefore, in order to lose one, he must acquire another. This is the test, the practical test; and it is hardly necessary to say how important it is to have a practical rule, and a general rule. One of the fixed rules on the subject is this: That a purpose to change, unaccompanied by actual removal or change of residence, does not constitute a change of domicile. The fact and the intent must concur. He must remove, without the intention of going back. The question here is whether he can abandon one, without acquiring another; and we think it has always been held that he can not. If he goes into another state, and returns for his family, his personal presence there, concurring with the intent, may fix his domicile there. But if he has not previously removed to the other state, he has not acquired a domicile there, or lost one here.

This case followed *Kilburn v. Bennett,* 3 Metc. (Mass.) 199, to which reference is made. These cases are closely related and seem to rule the one now before us. In addition to that, they support all our later cases.

See, also, *Kellogg v. Supervisors*, 42 Wis. 97, wherein it is said:

For the purpose of taxation and the discharge of those duties which every person owes to society and the government that protects him, a person can not be without a residence or domicile, so that, if he quits a place with intent to take up his residence or domicile in another, he may, while in *transitu*, have no domicile; 'but the more correct principle would seem to be that the original domicile is not gone until a new one has been actually acquired *facto et animo*.' Story on Conflict of Laws, section 47. We used the words 'residence' and 'domicile' interchangeably as synonymous terms under our statute. *Hall v. Hall*, 25 Wis. 600. And, in the language of Shaw, C. J., we say: 'The general rule, and, for practical purposes, a fixed rule, is that a man must have a habitation somewhere; he can have but one; and therefore, in order to lose one, he must acquire another. This is the test, the practical test; and it is hardly necessary to say how important it is to have a practical rule, and a general rule. One of the fixed rules on the subject is this: That a purpose to change, unaccompanied by an actual removal or change of residence, does not constitute a change of domicile.'

The following also support the rule we have adopted: *Littlefield v. Inhabitants of Brooks*, 50 Me. 475; *Schmoll v. Schenck*, 40 Ind. App. 581 (82 N. E. 805), and the many cases cited. Indeed, there seems to be no discordant note in the cases, in so far as they relate to the subject of taxation.

On the 1st day of January, 1910, Barhydt was domiciled in Burlington, Iowa; and that was the place of his residence for the purposes of taxation. He had not, by the widest stretch of imagination, become a resident of California, and at that time had not determined for himself where his residence would be in that state after his arrival there.

The district court was in error in canceling the assessment, and its judgment must be, and it is—*Reversed*.