MARGARET E. BRETT, Appellee, v. ALBERT H. BRETT, Appellant (two cases).

**MARRIAGE: Presumption—Burden of Proof.** A presumption of validity attends a consummated contract of marriage,—a presumption which will be overthrown only by clear and convincing evidence. Evidence reviewed in detail, in a case where the validity of a marriage was questioned on the ground that a foreign divorce was void, and held to establish the validity of said foreign decree and the consequent validity of a subsequent marriage,—the one in question.

**DIVORCE: Bad Faith of Innocent Party in Making Default.** The fact that one party to a marriage relation permits the other party thereto to secure a divorce by default, at a time when the former party had a cause for divorce against the one securing the divorce, does not show such bad faith as will deprive the one making default from acting thereon and contracting a legal marriage. So held where the parties, at the time of the action, were residents of different states.

**DIVORCE: Alimony—Absence of Children—Life Expectancy.** The fact that there are no children, and that plaintiff's life expectancy is greater than defendant's, is an element or circumstance which may be given some consideration in fixing alimony for plaintiff, the innocent party.

**DIVORCE: Alimony—$100,000.** Evidence reviewed, and an award of alimony in the sum of $100,000 approved.

*Appeal from Cerro Gordo District Court.*—C. H. KELLEY, Judge.

APRIL 6, 1921.

PLAINTIFF and defendant were married December 8, 1910, in Wisconsin, and lived together as husband and wife until August, 1917, except that she had left him for a few months, prior thereto. At the time of the trial, she was 53 years of age, and he was 55 or 56. There are no children by this marriage. Defendant had been married before, and divorced, but has no children. The plaintiff had one child by her first husband, years ago. On October 25, 1917, plaintiff filed her petition for separate maintenance, but later amended her petition, and asked for a divorce. She alleges that defendant has been guilty of adultery with three married women named, and others, and that he has been guilty of cruel and inhuman treatment such as to endanger her life, by charging her with being a prostitute, a syphilitic, a forger, and a liar, and by other misconduct; that he had violently assaulted and beaten the plaintiff in 1914, 1915, and 1916, culminating in an assault upon her in 1917, when she had him arrested, and finally left him. In the original petition, she charged that defendant was worth $60,000; but later, after a trust deed was set aside, she alleged that he was worth $446,000. She asked permanent alimony in the sum of $148,500. The answer and amendments deny the charges of adultery and cruelty, and the alleged value of his property. In his first answer, he alleged that his total assets were $40,600, and liabilities $35,564, leaving his net worth $5,036. The plaintiff claims that defendant's said alleged debts were fraudulent, and made for the purpose of defeating her claim for alimony. Later, he alleged that his property does not exceed $300,000. By his cross-petition, he alleges that his marriage to plaintiff was illegal and void, for the reason that plaintiff had not been legally divorced from a prior husband, Walter P. Byrum, on account of lack of legal residence of said Byrum, in obtaining a divorce from defendant in South Dakota, and lack of jurisdiction of that court. He asked to have his marriage to plaintiff declared void, and that it be annulled. The trial court denied defendant's prayer for annulment, granted plaintiff a divorce, and awarded her

$100,000 alimony, leaving undisturbed the award of $1,000 temporary alimony previously made, and decreed that each party should pay their respective attorneys' fees in the case. It was stipulated on the trial that defendant received, in the settlement of the trust case, $322,652.50, and that its present value was $365,873.50, and that the present value of defendant's properties was $422,693.50; but that, for the purposes of this case, the defendant was worth $375,000 net, above his indebtedness. It was also stipulated that the present value of the property of defendant, at the time of the separation and the commencement of this action, was $69,820, and that the net value of plaintiff's property at that time was $12,020. The defendant's parents were very old. In 1908, the father had conveyed to the brother of the defendant a large amount of property, by the terms of which conveyance only one third of the proceeds or net returns of the estate of the father was to be paid to the defendant during his life, "unless he should reform, and quit keeping company with immoral people, in which event he would get the fee." The defendant and others had brought an action against the brother, in 1915, to have such deeds by defendant's father and mother to the brother declared to be trust deeds, and to set aside a certain agreement, etc. That action was pending at the time plaintiff brought this suit, and was settled in October, 1918, by agreement, and defendant came into property of the value of about $322,000.

The second of the above cases, which was brought about a year after the determination in the district court of the first case, and which has been consolidated in this court with the first case, was a petition for a new trial of the original case. It was based upon an alleged falsification by plaintiff of a photograph of defendant and other women, taken in California. The trial court denied the application, and the petitioner therein, the defendant in the original case, appeals. The plaintiff has filed a cross-appeal from the allowance of alimony, asking that she be awarded $48,500 more permanent alimony.—*Affirmed on all three appeals.*

*E. A. Morling* and *Garfield Breese,* for appellant.

*Blythe, Markley, Rule & Smith,* for appellee.

PRESTON, J.—The record is very large. The parties seem to have combed several states for testimony. All the depositions, transcripts of evidence, and exhibits have been certified. The questions are largely of fact. There were many witnesses. The evidence is very conflicting. Every circumstance and detail has been threshed out. Manifestly, it is impracticable to state more than the general character of the evidence, and our conclusions.

The two main points relied upon by appellant are as to the legality of the marriage, and the amount of alimony in case the marriage is held to have been legal, and plaintiff entitled to a divorce. The other questions are argued, and elaborately, too; but the larger guns are trained upon the two propositions just stated.

1. Was the marriage between this plaintiff and defendant legal? The defendant herein has the burden. The presumptions are in favor of the validity of the marriage between the parties hereto. To overcome the presumptions, the evidence must be clear and convincing. *Farr v. Farr*, 190 Iowa 1005. It is doubtless true, as contended by appellant, that, if he has met the burden by the quality and quantity of proof required, the presumptions would be overcome.

1. MARRIAGE: presumption: burden of proof.

The trial court held that the Dakota divorce, which is attacked by appellant, was valid, and that the marriage between the parties to this action was a valid marriage. In reference to this matter, the trial court found that the South Dakota court, as shown by the findings of fact and conclusions of law, expressly passed upon the question of the actual and bona-fide residence of the plaintiff therein in the state of South Dakota; that the judgment is in accord with such findings of fact and conclusions of law, and, upon the showing made, the court in this case was of the opinion that such finding should not be disturbed; that the question of the bona-fide residence of a party is sometimes difficult to determine; but that, from the evidence in this case, were the court to treat it as an original proposition, it would have no hesitancy whatever in holding, and the court found, that said South Dakota court reached the correct conclusion, both as to the facts and the law, and that the judgment based thereon was and is fully warranted. The evidence in the

Dakota case was preserved, and appears in this record; and the plaintiff in that case, who secured the divorce from plaintiff herein, was a witness in this case on behalf of this plaintiff, in regard to his residence in Dakota.

In addition to the above finding, the court was of the opinion that neither this plaintiff's then husband nor the plaintiff herein is in a position to question that decree of divorce, because of the subsequent marriage of both her then husband and herself, since the Dakota decree was rendered; and further, that the decree could not be questioned by the defendant in this case.

It appears that, some 35 or 36 years ago, when the plaintiff here was about 17 years of age, she married one Shain, from whom she was divorced, 2 or 3 years thereafter, for conduct which amply justified a divorce, if it is as plaintiff claims. Subsequently, she married one Randall, who got into trouble, and she left him, and he secured a divorce from this plaintiff on the ground of desertion. Subsequently, and nearly 30 years ago,—to be exact, in 1892,—plaintiff herein married one Walter P. Byrum, who secured a divorce from her on July 10, 1903, on the ground of desertion. Byrum was a barber, without property or means, and had lived in different states. He and plaintiff lived in the state of Nebraska several years, where he was indicted for some sexual crime, and left Nebraska. Plaintiff refused to follow him, or to go with him, or to have anything further to do with him. The appellant challenges the good faith of the plaintiff in permitting her then husband to secure a divorce from her, when she had a cause for a divorce from him. But she was then living in Mason City, Iowa, and advised with the sheriff as to whether she was compelled to go to South Dakota and defend, who informed her she would not be compelled to go, unless she wished to contest the divorce. Either because she did not have the money to go, and to employ an attorney, or because she did not care to, she did not do so. We think this is not such bad faith as to have the effect claimed for it by appellant. After Byrum secured his divorce from plaintiff, both he and this plaintiff were married to others. He married another woman in Indiana, and of this marriage two children were born, both of whom are still living. Later, that wife divorced Byrum, and he was married again to

2. DIVORCE: bad faith of innocent party in making default.

a young woman with whom he is still living; and this plaintiff married one Catlin, of Mason City, Iowa; but, on account of his drinking and cruel treatment, she secured a divorce from him, and subsequently married the defendant.   Plaintiff testifies that, at the time of her marriage to the defendant, she told him of her prior marriages, and the result; that she would not stand for drinking, or his going with immoral women, or for being whipped; that she had had experience with those things before; that he said he had had troubles of his own; that she was convinced it would be satisfactory on both sides; that defendant told her he wanted to have a home, and to avoid all those things. The defendant admits that he had some conversation with plaintiff about her prior marriages.   Plaintiff believed she had a right to marry, and she and Byrum did marry others after the divorce, relying thereon.   Defendant does not claim that plaintiff fraudulently induced him to marry her.   They lived together about seven years.   The defendant claims that he did not discover the alleged invalidity of the Byrum divorce until about July, 1918. This was after the adulteries and cruel treatment charged against him, while they were living together as husband and wife, and while they both believed they were such.

Appellee contends that neither the plaintiff herein nor Byrum can question the validity of the South Dakota decree, and that plaintiff is, therefore, divorced, under Code Section 3151, and her marriage to the defendant is valid.   Many cases are cited on this proposition.   Some of the Iowa cases are *Mohler v. Estate of Shank*, 93 Iowa 273, 280, 282; *Hurley v. Hurley*, 117 Iowa 621, 622; *Ellis v. White*, 61 Iowa 644, 646; *Van Orsdal v. Van Orsdal*, 67 Iowa 35; *Shaw v. Shaw*, 92 Iowa 722, 725; *Leonard v. Leonard*, 174 Iowa 734, 738.   See, also, *Farr v. Farr*, supra.   It is further contended by appellee that the defendant cannot attack the Byrum decree, for the purpose of annulling his marriage to plaintiff, on the ground that Byrum was not a bona-fide resident of South Dakota for six months prior to the commencement of the Byrum divorce case, because this would be a collateral attack; and that a judgment valid as between the parties cannot be invalid as to third parties because of want of jurisdiction; and that, if one so acts as to estop himself from questioning a judgment, a third person may not take advantage

of the defect, and have the judgment decreed a nullity. A large number of cases are cited, among them the following Iowa cases: *Applegate v. Applegate,* 107 Iowa 312, 322; *Richardson v. King,* 157 Iowa 287, 296; *Johns v. Pattee,* 55 Iowa 665, 666; *Ruppin v. McLachlan,* 122 Iowa 343, 348; *Shawhan v. Loffer,* 24 Iowa 217, 227; *In re Appeal of McLain,* 189 Iowa 264; *Lang v. Lang,* (S. D.) 173 N. W. 443. See, also, *Farr v. Farr,* supra. It is still further contended that, under the facts in the record and under the law, Byrum was a bona-fide resident of South Dakota for more than the requisite time before he brought the action. A large number of cases from other jurisdictions are cited, and the following Iowa cases: *Richardson v. King,* supra; *In re Estate of Titterington,* 130 Iowa 356, 358; *Cohen v. Daniels,* 25 Iowa 88; *Barhydt v. Cross,* 156 Iowa 271, 280. See, also, *Gildersleeve v. Gildersleeve,* 88 Conn. 689 (92 Atl. 684, Ann. Cas. 1916B 920); *Turner v. Turner,* 87 Vt. 65 (47 L. R. A. [N. S.] 505); *Kenner v. Kenner,* 139 Tenn. 211 (L. R. A. 1918E 587, 589). Appellant cites *Beeman v. Kitzman,* 124 Iowa 86; *Heisinger v. Modern B. of A.,* 192 Iowa —, and other cases, to the proposition that a judgment without jurisdiction is void. But, as said in the *Applegate* case, supra, this is the general rule. It then takes up the question as to whether a judgment may be valid as between the parties and invalid as to third parties. Cases are cited by appellant to the effect that there is no such status known to the law of domestic relations as marriage by estoppel. Stated just that way, that may be true; but there are numerous cases holding that circumstances may be such as that a person is estopped from raising the question of invalidity. *Mohler v. Estate of Shank,* supra, and other cases before cited in the same connection. *Carpenter v. Smith,* 24 Iowa 200, and *Drummond v. Irish,* 52 Iowa 41, are cited to the point that marriage with one having a lawful spouse living is void, and that the proceedings do not raise a conclusive presumption of a valid marriage. It was so held under the facts of the cases cited. We do not understand appellee to dispute appellant's cases, and propositions that mere residence or presence alone of Byrum in South Dakota was sufficient. Other cases are cited by appellant on the question of the validity of a decree where neither of the parties is a bona-fide resident of the state.

This is on the assumption that defendant has shown that Byrum was not such a resident of South Dakota at the time he secured his divorce. We deem it unnecessary to discuss the many cases so cited, for the reason that, under the record, appellant has not shown that Byrum was not a bona-fide resident of South Dakota. We shall set out some of the more important facts bearing on this question. The South Dakota laws required six months' residence, before commencement of the action. There is no claim that Byrum was not a resident in South Dakota for more than six months before he commenced his suit; but the claim is that he was not a bona-fide resident. The record of the Dakota divorce was put in evidence by the defendant. The record is valid and regular on its face; so that, if Byrum was a bona-fide resident of South Dakota for the requisite period, the decree is, and has at all times been, valid as to all the world, irrespective of whether parties or third persons can question it. In Byrum's testimony in the divorce case, he testified that he had lived in Sioux Falls, South Dakota, where the divorce was granted, since the first of November, 1902, and that he had not been out of the city since; that he had no other home, and that Sioux Falls was his home; that he had no other home since November 1st; that he had worked in Indiana, Nebraska, and Michigan; that he wrote his wife to come to him, and she refused to come; that they had not lived together since the fall of 1900. The depositions of John and Jane Byrum were offered in evidence on that trial. Walter P. Byrum, testifying for plaintiff on this trial, says that, prior to going to South Dakota, he lived in Michigan; that he disposed of his barber shop in Michigan; that there were no social or business ties that held him there when he moved west; that he took all his belongings; that he was a bona-fide resident of Sioux Falls; that he believed he was legally divorced and competent to marry, and that he did marry; that, when he left Michigan, it was his intention to look up a location for a home; that he then had no thought of getting a divorce from his wife, and that he had no such thought or purpose when he located at Sioux Falls; that he had no other home, and that he expected to remain at Sioux Falls indefinitely; that he first conceived the idea of getting a divorce after he had been in Dakota a few months. It appears that he left Sioux Falls and

went to Indiana, September 13, 1903; that the only reason he left South Dakota was that he got a telegram that his father was sick, and for him to come home; that the reason he did not return to Sioux Falls was that his father was sick, his sister was in trouble, and they wanted him to stay; that he never was a resident of Indiana, and never had a home there until after he left Dakota. There is evidence that, before going to Dakota, Byrum was back and forth between Michigan and Indiana. Byrum's divorced wife, testifying for defendant, testifies that, when Byrum went west, he told her he was going to Dakota, but said nothing about coming back; that he came from Michigan to South Bend, and went west in November, 1902; that he had once lived out west, and talked about moving west again; that he liked the western country, and was going to look up a location there; that she did not understand that he was in South Bend in 1902 permanently; that she received a letter from him from Sioux Falls; that he said nothing about coming back to South Bend; that she had no idea of his ever coming back; that Byrum's father had a serious sick spell, after she was married, when the father died; that she knew Byrum was called home several times on account of sickness, before and after she was married. She was married to Byrum in January, 1904. She says she was not engaged to Byrum when he went west; that she knew he was a married man. Byrum's brother-in-law, Meisner, says that Byrum's father was sick in the fall of 1903, and that Byrum came back on that account, about September 1st; that his understanding from family talk was that Byrum's home was in South Dakota, and that he had no other home; that Byrum's father requested him to remain when he came back, because of his illness; that Byrum wanted to go back west, but remained on account of his father's sickness. The wife of the last-mentioned witness gave similar testimony. Byrum's mother says that she got letters from her son in Dakota, saying that he intended to make that his home; that he came back on account of his father's sickness. Mrs. Garrigan, testifying for defendant, says she lives at Sioux Falls; that she knew Byrum in 1903; that he roomed at her house.

"He spoke to me in regard to why he was here. He said he was here, I suppose, to get a divorce from his wife. Q. State

what he said in regard to this matter. A. He said he would be here for about six months. I think he said he was going to Indiana when he got his divorce, but I wouldn't say for sure."

On cross-examination, she says that she can't remember everything that was said; that she does not remember just the conversation. It will be observed that her testimony is not very positive; and, when we consider that her testimony was given some 15 years after the conversation, it is not persuasive.

It is thought by appellant that there is some contradiction in the testimony of the Byrum family as to why Byrum returned to Indiana. Some of them claim that he returned because of letters to him. There is some conflict in the evidence as to just the time his father was sick. Some of the testimony tends to show that he was not sick at that time, and that he was away. It is also thought by appellant that there were contradictory reasons given by Byrum himself for going to Dakota; that he first went to Worthington, Minnesota; that he went by chance from Minnesota to Sioux Falls, where he happened to get a job in a barber shop: but his evidence does show that he went west to look for a location. It is claimed by appellant that the record shows that Byrum was a wandering, irresponsible individual. It appears that, in 1900, he was indicted in Nebraska for adultery. He claims that it was a case of blackmail by other barbers. His demurrer to the indictment was sustained, and on appeal the ruling was reversed. *State v. Byrum,* 60 Neb. 384 (83 N. W. 207).

Such is the substance of the testimony on this point, though there are other circumstances, details, and more or less contradiction. Without further discussion of the evidence, we think the evidence abundantly shows that Byrum was a bonafide resident of Sioux Falls, South Dakota, at the time of the divorce; that the divorce was legal; and that plaintiff was competent to enter into a valid marriage with the defendant at the time they were married. Under the evidence, Byrum was in Sioux Falls about nine months before the divorce, and about a month afterwards. It would be possible, of course, that a person going to Dakota for that length of time before the divorce could do so for the purpose only of obtaining a divorce, but it does not necessarily follow that such was the case. The cir-

cumstances might be such as that a person could go a short time before the requisite time and leave soon after, and still be in good faith about it, and a bona-fide resident. Taking the evidence as it is, we are, as said, satisfied with the finding of the trial court at this point.

2. The next question is whether plaintiff is entitled to a divorce from the defendant. To go into the details of the mass of evidence would unduly prolong the opinion. The trial court found and stated:

"The evidence of the defendant upon the witness stand and the numerous letters introduced in evidence written by and to him, standing alone, are, in my opinion, sufficient to warrant the granting of a decree of divorce to plaintiff. Taking such evidence in connection with all the other evidence introduced upon the trial, I readily reach the conclusion that a decree of divorce ought to be, and the same is, hereby entered for plaintiff, as prayed."

The claims of the plaintiff are all contested by the defendant, and either denied or explained. Without going into the evidence, we are convinced that defendant has been proven, by the greater weight of the evidence, guilty of adultery with one or more of the women referred to in the evidence, and that he has been proven guilty of cruel and inhuman treatment, such as to entitle plaintiff to a divorce on both grounds. Some of the circumstances bearing upon these points will be referred to in the next paragraph of the opinion, in passing upon the amount of alimony. We shall refer to them with reference more especially to the character of both plaintiff and defendant, as bearing upon the question of alimony. To avoid repetition, we shall not go into the circumstances more in detail at this point.

3. We surmise that the real nub of the entire case is in regard to the size of the alimony, plaintiff claiming that she is entitled to more than was awarded her, which she claims should 3. DIVORCE: ali- be one third of all defendant's property, or, at mony: absence least, one third of the net value of his property of children: life expectancy. as stipulated, or $125,000 as her alimony. The writer is of the opinion that the allowance should be increased in at least the last-named amount, so that she would receive one third of defendant's property, but the other members of the

court are of opinion that the amount awarded by the trial court is approximately just. Defendant claims that she is not entitled to as much as was allowed. There is, of course, no fixed rule as to the amount. The circumstances of each case govern. Under Code Section 3180, such an order as to property is to be made as "shall be right." We are satisfied from the record that defendant is a man with the sexual passion abnormally developed, and that his passion is gratified with little or no effort at restraint. The record does not show, and we do not understand defendant to claim, that the plaintiff has been sexually impure. Defendant's principal claims against her are that she is high-tempered, found fault with him in regard to his habits, and accused him of being immoral, and has accused him of being intoxicated, and that, in some instances, she so accused him when he was not in that condition. He also claims that, at times, she drank liquor with him and with their friends. We shall refer to some of the more important circumstances, and to some of the cases relied upon by each, to sustain their several contentions. A determination of the amount necessarily disposes of both defendant's appeal and plaintiff's cross-appeal, as to the alimony.

Appellee argues that, under the modern rules, the sum payable is in lieu of her right of dower, maintenance, or prior duty to support; that the court may, in its discretion, consider the nature of the husband's offense, and award something in addition as compensation for injuries; that, if defendant has the ability to pay, the plaintiff is to have such an allowance as will maintain her in the style and condition that her husband's fortune would have reasonably justified her maintenance, but for his infidelity; that she is not to be put upon a stinted allowance because the husband has been unfaithful to his marriage vows, but that this is rather a reason, if his estate be ample, that she should receive a generous and liberal support; that, in some cases, though not all, equity may be accomplished by treating the wife as if the marriage had been dissolved by death, and allowing her the rights of a widow; that equity requires that the husband should not profit by his own wrong. 2 Nelson on Divorce & Separation, Sections 903, 905, 908, *Spain v. Spain,* 177 Iowa 249, 252, and *Carr v. Carr,* 185 Iowa 1205, are cited to sustain these different propositions, some on one point and some on

another. Under one of the propositions just cited, in 2 Nelson, appellee argues that, in the instant case, since there are no children, and since plaintiff's life expectancy is greater than defendant's, she would, in case of his death, be entitled, under the law as it now is, to more than one half of his estate. While we are not approving that proposition, as a fixed rule, we think it is a circumstance to be considered with all the others. *Closz v. Closz,* 184 Iowa 739, is referred to. In that case it did not appear how long the parties were married, or whether they had children; but the wife was granted a divorce on the ground of cruelty, and given substantially half of defendant's property. This decree was modified somewhat on appeal, and she was given approximately one third. The court said, in that opinion, that, under the record, plaintiff was not, in all respects, a model wife, and that she fell below the average in meeting her marital duties.

Her chastity was impugned, but this charge was not established, though she was inclined to free-love theories, and she persisted in improper associations with men, over her husband's objection. There was nothing in the record calling for an extraordinary allowance. Other cases are cited in that opinion as holding that the allowance must be regulated by resources, rather than by necessity; that the relative or comparative fault of the parties is material. Appellee contends that the evidence is such in this case that the wronged wife is entitled to an extraordinary allowance, because the evidence shows that defendant considers the privilege of committing adultery as one of the inalienable rights of a husband, and because of his numerous adulteries and his depraved character. Her counsel concedes, however, that, under ordinary circumstances, the amount allowed by the trial court would be adequate and equitable, but for such special circumstances. Appellee cites *Hiecke v. Hiecke,* 163 Wis. 171 (157 N. W. 747, 750), as holding that generally a liberal allowance to the wife is one third, but that this may be increased to one half or more, for special circumstances. Appellee cites further *Daly v. Daly,* 154 Iowa 486, 491, *Muir v. Muir,* 133 Ky. 125 (92 S. W. 314, 4 L. R. A. [N. S.] 909), *Kelly v. Kelly,* 183 Ky. 172 (209 S. W. 335), *Nathan v. Nathan,* 102 Neb. 59 (165 N. W. 955), *Edholm v. Edholm,* 99 Neb. 331 (156 N. W. 500), *Fitzpatrick v. Fitzpatrick,* 127 Minn. 96 (148 N. W. 1074), and other cases,

as being somewhat analogous. In some of them, however, there were children, and in others, one or the other, or both, helped accumulate the property.

On the other hand, appellant contends, in substance, that there is no equity in raising so largely the scale of living to which plaintiff had been accustomed at the time of and prior to the commencement of her suit; that she had no part in earning defendant's larger estate, or any of his estate; that the amount awarded is grossly excessive, and that it is confiscatory; that the only possible claim that plaintiff can assert is to such an allowance as is measured by the existing duty of support. Among the cases cited to sustain such position are *Sweatt v. Sweatt,* (Iowa) 176 N. W. 785 (not officially reported); *Meyer v. Meyer,* 187 Iowa 617; *Carson v. Carson,* (Iowa) 171 N. W. 584 (not officially reported); *Arment v. Arment,* 154 Iowa 573; *Martin v. Martin,* 150 Iowa 223; *Parsons v. Parsons,* 152 Iowa 68; *Martin v. Martin,* 65 Iowa 255, 256; *Zuver v. Zuver,* 36 Iowa 190; *Hartl v. Hartl,* 155 Iowa 329; *Barr v. Barr,* 157 Iowa 153; *Daly v. Daly,* supra; *Weidert v. Weidert,* 106 Wash. 410 (180 Pac. 135); *Bialy v. Bialy,* 167 Mich. 559; *Von Trott v. Von Trott,* 118 Wis. 29 (94 N. W. 798); and other cases. We shall not review the cases, but go now to some of the circumstances and claims pro and con of the parties. The record is so voluminous and the circumstances so numerous that it would be out of the question, in referring to the different circumstances, to detail all the evidence bearing on that point, or the contradictions and explanations. There is much evidence in the record to show that defendant is such a man, and his conduct such, as we have already indicated. Many of the circumstances are clearly established against him. Others are not so clearly established. Naturally, all are either denied or there is an attempted explanation, and some are so explained as to weaken the plaintiff's evidence in reference thereto. As we have said in some of our cases, there is a tendency to color, in divorce cases.

As said, there are no children. It is true plaintiff did not help accumulate the property, especially that part received by defendant from his parents. Neither did defendant. To inherit it from the father did not require any especial ability or effort. Appellee urges that whatever was done, was done by her while

defendant was carousing with others. Appellee says that she stood by the defendant in regard to the litiga-

4. DIVORCE: alimony: $100,000.

tion by which defendant secured the settlement of the trust suit. Though disputed by appellant, we think this claim is established; that she did, at the request of her husband's then attorney, and of his parents, render such assistance as she could in that matter. Appellant, in contradiction of this, argues that, because plaintiff telephoned to, and visited a time or two with, some of those who were opposed to defendant in that litigation, she was trying to defeat the defendant therein. This is somewhat inconsistent with their claim that plaintiff married the defendant for money, and that she is trying to get all she can. Had she been attempting to defeat the defendant in securing the property from his father, she would have reduced her chances of securing large alimony.

Referring to some of the circumstances bearing upon her character and conduct, and that of the defendant, it appears that defendant's mother and other witnesses seem to agree that, in 1911, there was no trouble between plaintiff and defendant, and plaintiff so says; but she says that, in 1912, defendant resumed his prior habits and relations with other women. Defendant's mother, at that time, was friendly to the plaintiff, but later was more favorable to her son. During a part of plaintiff's married life with defendant, she kept a large 24-room rooming house, took care of it, and did the house work and the washing, or a part of it. Eight or ten witnesses, who lived at or near the house of the parties, and who had an opportunity of knowing her character and habits, testify that she was a hardworking, good-natured, industrious woman, and an excellent housekeeper. Some of them say that, at the time she was married to defendant, she was a nice-dispositioned woman. Some of them qualify this somewhat, on cross-examination, by saying that she had a temper. Defendant's witnesses, some of whom, it seems to us, are not entirely credible, testify as to her temper, and that, at times, she used bad language, was fault-finding, and participated in some of the drinking bouts. We are inclined to think that, because of defendant's conduct and treatment of her, there was at least some provocation for her

conduct. But conceding that she was not, at all times, a model wife, still she was his wife, and his faults were the greater.

The lawyer who was then acting for defendant in the alienation case, or some other litigation, and who naturally was well acquainted with defendant and with his habits and disposition, told plaintiff, so she testifies, that he would not ask a dog to live with defendant; that this was when she read letters that she had received in regard to some of defendant's troubles in Dakota. This is not denied; but appellant says that that lawyer's attitude is shown by some of the lawyer's letters, which will be referred to in a moment. On February 6, 1916, plaintiff wired the attorney referred to, from California, that, on that morning, defendant struck her with his fist, slapped her, kicked her, and threw her on the bed.

"Things have become unendurable; why should I be called upon to endure? I feel my life is in danger. You will understand, I wish him well—a woman in the deal."

A few days thereafter, the attorney wired or wrote her from Mason City:

"Stand by Al in this emergency. Help him all you can. It is vital for his and your interests. * * * Treat everything as a lie until proved."

A few days thereafter, the same attorney wrote plaintiff a letter, from which we quote:

"I can easily understand, from all you say, that your feelings are very sorely tried, and your position far from a comfortable one, on account of the things which have developed out there recently. * * * I am simply telling you the candid truth: that, in my opinion, there is but one course for you to pursue in the present emergency, and that is for you to conquer your feelings. * * * You, I know, are wise enough to see that this suit against Al is precisely the sort of game they would stage against him out there, in order to drive him into a settlement, and thus let George out of a very sorry position. In bringing this case against Al at this time, they have only helped to dish their soup; for it will drive Al further from a settlement. What Mr. Morling and myself are aiming at is to get Al his full share, and to get it free from George's guardianship or control. We'll do this, if Al does half his share, and I feel he will now, and is

doing so. * * * Your interests and Al's are identical. * * * Do not, for one moment, think of taking sides against Al, * * * then, no matter how this last case comes out, your loyalty will be your best and biggest asset, believe me.''

We understand this letter to refer to an alienation suit brought against defendant in California, and to the suit pending in Iowa to set aside the trust agreement as to the property. A witness for defendant, who had formerly been on good terms with both plaintiff and defendant, testifies that she has known plaintiff 8 or 9 years, and that:

''Plaintiff has a violent temper. Have seen her angry a number of times. Have heard her call names which did not sound very nice,—called Al a son of a bitch. She sometimes used the language I have referred to, with an oath, such as 'damn.' ''

This witness admits writing a letter to plaintiff in 1916, in which she says, in part:

''You surely are having trouble. * * * How could you put up with so much from that man? You surely think the whole world of him, or you could not—but guess you are taking the right way. I got your letter Thursday, and that evening, the same piece came out in the Globe-Gazette. Guess there were 20 people called me, after that event, to talk about it, and most of them said, 'His wife will leave him now, won't she?' and I told them I did not think so, but most women would. Some thought it a put-up job; but I don't think so, for I have heard about Mrs. Adkins before, and saw letters, too. * * * You have done enough worrying to drive most women insane.''

The Adkins woman referred to in this letter is one of the parties with whom defendant was, as we think, proven guilty of adultery, and whose husband secured a judgment against defendant for alienation, in California. This case was, however, reversed on appeal, for error in instructions and admission of evidence. Plaintiff's evidence tends to show that, when she remonstrated with defendant for his adulterous course with other women, he became violent, and struck her; that he wrote one woman that plaintiff ''ought to be hung,'' and that another should ''knock her head off and have her arrested for trespass;'' that he called her a lying brute; that defendant told two women

to address letters to a certain box, in care of a friend, in order
"to keep the old lady from knowing anything." The letters by
defendant to other women, and from them to him, are nearly,
if not quite, enough to show improper sexual relations between
defendant and other women; and yet defendant testifies that he
thinks his wife had no cause to be jealous because of any of these
letters, or all of them combined; that it would not be enough in
any fair-minded kind of a person. In a letter written by
defendant in 1911, speaking of his father, who, at the trial, was
about 90 years of age, defendant said:

"Father acts like a crazy man, and makes me mad enough
to kick his behind."

On this trial he was asked as to his evidence on another trial
about his father.

"Q. What did you intend to convey by the next sentence
here: 'An old devil like him ought to be cut?' A. Well, I
couldn't tell you. Q. You meant he ought to be castrated,
didn't you? A. Well, I presume it was something of that sort."

In 1912, a woman wrote defendant, saying:

"Be careful of your letters, and don't let the old hen get
them; the old hen is laying for you."

Defendant wrote the same woman:

"Address box 1857, no name at all, Los Angeles. She got
your last letter, and that started things."

In a letter to his mother in 1913, defendant wrote of his
wife:

"She ought to be hung, as there is nothing too low for she
to say or do."

Plaintiff testifies that defendant communicated a venereal
disease to her; that he took her to a doctor; that she did not
sleep with him for three months; that he told her he was through
with the disease, and she supposed he was. She says she did
not intend to leave him, if he would reform and do different;
that she tried to keep track of defendant since 1915, on advice
of his lawyers. There is other evidence on this subject than that
of plaintiff. Defendant denies that he communicated the disease
to her. There is a conflict in the evidence as to whether he did
so. We shall not stop to go into the evidence further on that
point. The evidence shows that defendant registered at hotels

under assumed names. He did so at Catalina Island, and registered himself and another woman as his wife. Though the evidence as to whether he did so, and occupied a room with her at that time, is in sharp conflict, we are satisfied that plaintiff has established that fact.

Referring briefly to some of the circumstances tending to show cruel treatment, it is claimed by plaintiff, and the evidence in her behalf tends to show, that on February 6, 1916, defendant had been drinking, came home late at night, assaulted her, and at that time fractured two of her ribs; that, because of her promises made to his attorneys and his father and mother to stay with him, she sent the wire from Los Angeles to defendant's attorney, which has been before referred to; that, in October, 1916, defendant assaulted and struck plaintiff, and left her bleeding on the porch, and drove away in his automobile. Another witness for plaintiff testifies that, in 1915, defendant came to her house, to get her to go over and see Mrs. Brett, and defendant said he had struck her; said she kept agitating things until he couldn't stand it any longer, and he struck her. The same witness testifies that she saw plaintiff in 1916, when her face was swollen, and her lip and eye black, and plaintiff said that defendant had struck her. Plaintiff testifies regarding this transaction. In August, 1917, plaintiff says, defendant threw her off the porch, four feet high; threw a milk bottle at her, saying that he would brain her. At this time, plaintiff had defendant arrested, and left him, deeming it unsafe to longer attempt to live with him. There is more or less denial and explanation as to these circumstances. Defendant testifies:

"I came home and she wanted to know where I had been. I told her, 'Up town.' She accused me of being out riding with a woman. When I said I wasn't, she called me a liar, and said someone phoned her about it. She cursed and swore, and got into a rage, and grabbed the butcher knife. I just turned her around and slammed her up against the casing of the door, face first, and it bruised her face and mouth some."

Defendant also testifies:

"Q. Now you say, 'She ought to have beat her up.' That is, Mrs. Nelson ought to have beaten your wife up. What did you mean by that? A. Well, I think, if she wasn't doing those

things, most any reasonable person would have kicked her out. Q. But if she had objected to any immorality on her part, and if she objected to any immorality on your part, selling beer, or drinking, or running around with any immoral people, you would kick her out or beat her up, wouldn't you? A. I would kick her out just the same as I would you, if you came over there when I was running the house."

Some of defendant's witnesses testify that he was square and all right, so far as they knew.

There is, of course, much more in the testimony, pro and con, but what has been said is substantially a pen picture of the two parties. Considering all these circumstances and the entire situation, the writer sees no reason why the plaintiff should not have at least one third of his property awarded to her as alimony. I would affirm on defendant's appeal, and modify the finding of the trial court, to the extent indicated, on plaintiff's appeal. But, as said, the majority are of the opinion that the award should stand.

4. As to the second appeal from the denial of the application for a new trial, it seems to us that the matter is too insignificant to upset all the evidence introduced on the original trial. The application for a new trial is based almost entirely upon a photograph which was introduced in evidence on the original trial as one of the circumstances tending to show defendant's adultery with one of the women against whom adultery is charged. It was claimed that the woman by defendant's side in the photograph was such woman; whereas, it turns out that such was not the fact. It also appears that, in the original photograph, defendant was taken with four women, one of whom was by his side, and the other three back of them, and higher up on the rocks. In the photograph used on the original trial, the three women at the rear did not appear. Appellant contends that plaintiff's conduct in that regard was a fraud upon the court, and that, this being so, her evidence on the original trial is weakened, and her credibility and good faith impaired. We have before indicated that the evidence was sufficient to warrant a divorce, as to at least some of the grounds, without the testimony of plaintiff as a witness. It appears that the photograph used on the original trial was indistinct, so that the features

of the woman shown were not clear.  It is shown by the evidence that appellant was himself misled as to the person whose picture was represented.  This being so, plaintiff may have, herself, been misled.  The court remarked in its finding that:

"It is so vague and indistinct that I am not at all surprised that Mr. Brett and Mrs. Brett were misled by the picture, starting out with the assumption that it was Mrs. Dalton.  If they had started on the assumption that it was somebody else, I think the chances are that both would have agreed.  That picture, to me, is very, very indistinct.  As suggested by one of the witnesses, some of the reproductions are much more distinct; but, taking the picture as it is, I would not be at all sure that I could identify it, even if I knew who the original was, because of the shadows and indistinctness."

The court found that there was no fraud or bad faith shown on the part of appellee.  At the original trial, the defendant claimed that the picture was taken at a beach picnic, and that it was a joke, and there was nothing serious about it.  The lady sitting by defendant was not a stranger, but an acquaintance of his.  There is no difference between the photograph on the original trial and the one presented on the petition for new trial, so far as it relates to the defendant, and the lady sitting by him.

Without prolonging the opinion, we reach the conclusion that the decree in favor of plaintiff, granting her a divorce and alimony, ought to be, and it is, affirmed; and it is affirmed on plaintiff's appeal.  We also conclude that the court did not err in overruling appellant's motion for new trial, which appeal is also affirmed.—*Affirmed on all appeals.*

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.