ELLA M. MILLER, Appellant, v. HARRY D. MILLER et al.,
Appellees.

**DIVORCE: Alimony—Justifiable Refusal to Increase.** The refusal of
the court to increase a former award of alimony finds full justifica-
tion in the fact that, at the time of the application for the increase,
the applicant was in affluent circumstances.

**DIVORCE: Foreign Decree—"Full Faith and Credit"—Comity.** The
"full faith and credit" clause of the Federal Constitution does not
*compel* the courts of this state to recognize as valid a default de-
cree of divorce against a defendant domiciled in this state, rendered
in a foreign state in appropriate proceedings *in rem*; but such a
decree, when valid on its face, will, as a matter of reciprocal comity
between the states, be recognized as valid in this state, in the ab-
sence ·of allegation and proof of fraud in obtaining it.

**DIVORCE: Foreign Decree—Effect on Property Rights.** The recog-
nition of the validity in this state of a foreign divorce decree *in
rem* does not preclude the courts of· this state from adjusting the
*property* rights of one of the parties, under. a decree in this state
for separate maintenance.

Headnote 1:  30 C. J. p. 1095.  Headnote 2:  19 C. J. pp. 372, 373, 374.
Headnote 3: 19 C. J. p. 367; 30 C. J. p. 1076.

*Appeal from Lucas District Court.*—W. M. WALKER, Judge.

DECEMBER 15, 1925.          · ·

THE petition in this case is in the nature of a creditor's
bill.  As such it was sustained.  The petition also contained al-
legations and a prayer for additional alimony, in a separate
maintenance suit which had been brought many years ago in
the same court.  There was a cross-bill by the defendant, resist-
ing the claim for additional alimony, and praying that all rights
of alimony be terminated on the ground that the defendant had
obtained a divorce in Missouri, the state of his domicile.  There
was a decree awarding plaintiff judgment against the defend-
ant for alimony accrued, and denying her further alimony.
From this decree she has appealed.—*Affirmed.*

*Bates & Dashiell,* for appellant.

*Stuart & Stuart, J. A. Penick,* and *W. W. Bulman,* for appellees.

EVANS, J.—I. It appears from the record that plaintiff and defendant were husband and wife, and were domiciled in Lucas County; that, in September, 1912, the plaintiff obtained a decree of separate maintenance on the ground of cruel and inhuman treatment, and on the ground of desertion as of July, 1911. The separate maintenance awarded to her was $25 per month, no part of which has ever been paid by the defendant. The defendant left the state of Iowa, and went into the state of Missouri, and acquired his domicile there. The plaintiff remained in Lucas County, and maintained herself and the only child of their marriage, a son, now 27 years of age. It appears also that the parents both of the plaintiff and of the defendant, respectively, resided in Lucas County. The plaintiff received from her parents the use of an 11-room house in the city of Chariton, wherein she followed the business of keeping boarders and roomers. Such was her means of livelihood for many years. She filed her petition herein in February, 1923. The occasion for it was that the mother of the defendant had recently died, whereby the defendant had inherited from her estate property to the value of about $3,000. The petition sought to reach this property in satisfaction of the unpaid installments provided for separate maintenance. The petition further set forth that the defendant's father was old and feeble, and was likely to die ere long, and it prayed that the prospective interest of the defendant in his father's estate be subjected to the claims of the plaintiff. The petition further prayed that, because of the changed financial condition of the defendant, the allowance of maintenance to the plaintiff should be increased accordingly, and that the same should be made a lien upon present and prospective property interests of the defendant.

The defendant filed a cross-bill, wherein he averred that the plaintiff herself had, previous to the filing of her petition, become owner, by inheritance through her father and mother, of much valuable property, and that she received a large and ample income therefrom. He further pleaded that in 1921 he had ob-

tained a decree of divorce from the defendant in the state of Missouri, whereby the marriage status of the parties had ceased. He prayed that he be relieved from further payments of maintenance under the provisions of the *original* decree. The decree permitted the plaintiff to recover the installments of maintenance provided in the *original* decree up to November 1, 1923, the date of the *present* decree, and terminated all further obligations of defendant in the premises.

It will be noted that the foregoing presents a medley of pleading. The petition did not purport to be filed in the separate maintenance case at all. It did predicate its allegations of right in the plaintiff upon the provisions of such decree. The decree in the former case was put in evidence; the petition was not. We might well refuse to consider the question of alimony and maintenance on that ground; but both parties appear to have treated both actions as amalgamated, and to ask relief accordingly. We shall, therefore, ignore this feature of the pleadings.

The trial court refused the increased maintenance prayed for by the plaintiff. This was done notwithstanding that it was made to appear, by a supplemental petition filed after the hearing of evidence, that the father of the defendant had died, pending the suit, and that the defendant had thereby inherited approximately $50,000 worth of property. As against this, the plaintiff herself had, some years prior to filing her petition, inherited from her parents large property, somewhat less than the amount now inherited by the defendant. The situation thus presented clearly warranted the court in refusing to give any further consideration to the question of maintenance. At the time the plaintiff filed her petition, she was in much more affluent circumstances than was the defendant, who at that time, and for several years prior thereto, had been a mere laborer, working for the wages of the day. We find no ground in the record for our interference with the order of the court refusing to increase the plaintiff's allowance.

1. DIVORCE: alimony: justifiable refusal to increase.

II. The decree appealed from recognized the validity of the divorce decree rendered in Missouri, and treated the marriage of the parties as having been dissolved thereby. In ef-

2. DIVORCE: foreign decree: "full faith and credit:" comity. fect, however, it awarded alimony to the wife to the extent of extending the monthly installments to November 1, 1923, which date was two years subsequent to the dissolution of the marriage by the Missouri decree. The complaint directed to this feature of the decree is that the court should not have recognized the Missouri decree as being valid in Iowa; that, so far as the wife was concerned, her status should be deemed unchanged; and that her right to receive the monthly installments awarded to her in 1912 should be deemed unimpaired.

The question at this point is whether the court was justified in recognizing the validity of the Missouri decree. The argument is that the "full faith and credit" clause of the Federal Constitution does not apply to a foreign default decree of divorce, against a defendant domiciled in another state. It is conceded, however, that the courts of this state may properly give effect within this state to such a decree entered in another state, as a *matter of comity between states,* where such course is not in contravention of the laws or public policy of this state. The argument and the concession properly cover the present state of the law on this subject. The further contention is that comity ought not to be extended.

For many years, the courts of all the states of the union, save three or four, have recognized default decrees of divorce entered in another state, and valid therein, as being effective everywhere to dissolve the marriage *status,* notwithstanding the nonresidence of the defendant spouse therein and the want of personal jurisdiction over him. That the plaintiff in the divorce proceeding should, in good faith, have had his *domicile* within the state and within the jurisdiction of the court entering the decree, has usually been regarded as the controlling jurisdictional fact. This recognition of the validity of foreign decrees of divorce doubtless came into vogue under the assumption that the "full faith and credit" clause of the Federal Constitution required such recognition. Such assumption was predicated upon the pronouncement of the Supreme Court of the United States, so construing the Federal Constitution. *Atherton v. Atherton,* 181 U. S. 155; *Cheever v. Wilson,* 9 Wall. (U. S.) 108.

In *Haddock v. Haddock,* 201 U. S. 562 (1906), the Supreme Court changed its former position, and held that the "full faith and credit" clause of the Constitution did not apply to a default decree of divorce entered in a state other than that of the matrimonial domicile, where no personal jurisdiction had been acquired over the defendant therein. The *Haddock* decision was predicated upon the following facts: In a suit in New York, it appeared that the parties had been domiciled in New York, and that the husband abandoned his wife and went to Connecticut, and there obtained a divorce. The New York court, in the subsequent suit by the wife, refused to recognize the validity of this divorce, and on appeal to the Supreme Court of the United States, it was held that the New York court was not bound, under the Federal Constitution, to give "full faith and credit" to such decree. The reasoning was that the Connecticut court had acquired no jurisdiction over the defendant-spouse, and therefore the "full faith and credit" clause of the Constitution did not apply. This pronouncement was later followed by the same court, with some qualification, in *Thompson v. Thompson,* 226 U. S. 551.

Though this pronouncement lifts from the courts of the respective states the mandate of the Federal Constitution, it interposes no obstacle in the way of such courts to recognize the validity of such foreign decrees as a matter of comity between states. On the contrary, such right is recognized in the *Haddock* case. The state of New York, through its courts, has always taken the exceptional position that it will not recognize the validity of a default decree of divorce rendered in any state other than that of the matrimonial domicile, where the defendant remains within the matrimonial domicile, and where personal jurisdiction of the defendant is not acquired. The practical results of such holding have been quite appalling. It is quite universally conceded that *status* is the *res* of a divorce proceeding; and that it may be dealt with by proper procedure *in rem* upon the application of one party to the marriage, and without personal jurisdiction of the other. In such case the decree is *in rem*. Nearly universal, also, is the view that the place of domicile, of one or both parties is the place of jurisdiction over this *res*. Wherever the domicile of either party to

the marriage, there will be jurisdiction over the subject-matter, and this jurisdiction may be rendered effective by appropriate procedure.

Under the New York doctrine, a decree of divorce duly granted in the state of the husband's domicile, but not in the state of the matrimonial domicile, will not be deemed valid as against the wife, domiciled in New York, unless personal jurisdiction had been acquired over her within the state where the decree was rendered. In such a case the plaintiff is still a married man if he enters the state of New York. If he has remarried, he becomes a bigamist; if he has children of the remarriage, they become illegitimate. A status is forced upon him there which cannot be recognized in other states; whereas the status which will be forced upon him in other states will not be recognized in New York. The argument for such a doctrine is that the state of matrimonial domicile has the jurisdiction of the marriage status, and has a right to maintain it to the exclusion of all other states, as long as either spouse continues his domicile there. It is undeniable that the husband has a constitutional right to change his domicile from one state to another at any time he chooses. It is equally true that, in the event of separation for a good cause, the wife has the right to choose her domicile without regard to that of her husband. The marriage status necessarily rests upon each of them, wherever their domicile. Each spouse has a status as a married person, which will be recognized and enforced by the body politic of the domicile of each. This presents a case of dual jurisdiction, and not a conflict of jurisdiction. Assuming that a sovereign state is under duty to protect the status of its inhabitants, as is contended in support of the New York doctrine, still its duty extends no further than its power, and its power no further than its boundary lines. The power of a sovereign state to protect or continue the marriage status of its inhabitants can exist only so long as both spouses keep their domicile within its territorial jurisdiction. If the husband departs, and establishes domicile in another state, the power and duty of the second sovereign state are necessarily equal to those of the first. Both sovereign states may co-operate to *maintain* the status, but either one has power to *destroy* it. The power of the first state necessarily

ceases to be exclusive when one spouse becomes lawfully domiciled in and subject to another sovereignty. A marriage status may be likened unto a structure, whose beams rest upon supports at either end. If it be conceived that separate sovereignties acquire dominion over the separate supports respectively, then the exclusive power of each is greater to destroy than it is to conserve. They must concur, in order to maintain; whereas either one has power to destroy.

If one sovereignty has power to decree a divorce to its own inhabitant, the other has the same power, as a necessary incident of its sovereignty. From the very nature of the case, there can be no such thing as a dissolution of the marriage as to one spouse and a preservation of it as to the other. One cannot be deemed married and the other unmarried. It is the *union* of the two spouses that constitutes the status. When the union is made twain by a divorce in one state, the status has lost one of its essential supports, and necessarily falls.

One line of reasoning adopted in support of the New York attitude is that, unless the husband has a good cause for separation, he should not be permitted to acquire domicile in another state and thereby to confer such domicile upon the wife; that, unless the wife has good cause for separation and divorce, she cannot acquire domicile in another state, and cannot therefore maintain an action for divorce there, because the domicile of her husband will be presumed to be her domicile. This argument implies that either spouse who *has* good cause for separation and divorce may acquire separate domicile. This reasoning mingles the question of jurisdiction with the question of meritorious ground of divorce. If the applying spouse has no good cause for separation and divorce, then presumably he cannot obtain a divorce, even though the court has jurisdiction to grant one. The awarding of decree is a finding by the court that the applicant did have cause for separation. There may be jurisdiction in the court without merit in the cause. Though the decision in the *Haddock* case is a very important one, its scope is, nevertheless, quite limited. It is necessarily confined in its scope to the interpretation of the "full faith and credit" clause of the Federal Constitution. Its holding is that no state is under the compulsion of this clause to give "faith and credit"

to a divorce decree *in rem* entered in another state. It does not purport to make divorce law. The Federal power has no divorce jurisdiction. The responsibility for divorce law, whether by legislation or by judicial decision, still rests upon the several states. Every state in the Union, save four or five (including New York, New Jersey, Pennsylvania, both Carolinas, and perhaps Massachusetts), has assumed jurisdiction over the marriage status of every inhabitant having a legal domicile therein, and has conferred power upon its courts to dissolve such status by decree *in rem* for meritorious cause, and pursuant to proper procedure. Indeed, the excepted states themselves have assumed jurisdiction over such marriage status of their domiciled inhabitants. True, one of them (South Carolina) permits no divorce to be granted. That is not a repudiation of its jurisdiction, but, on the contrary, is a severe exercise of it.

Granted, therefore, that, under the pronouncement in the *Haddock* case, this state, through its courts, is not bound to give "faith and credit" to the default decrees of divorce in another state, the question remains, what is the proper and practical course for us to follow? Though the *letter* has released us, the spirit of the Constitution still bids reciprocal comity between the states. Nothing less can be conducive to the harmony essential to the co-operation of the states, as members of one body and of a larger sovereignty of their own creation. Shall we extend comity to our sister states, or shall we align ourselves with the New York doctrine here considered? From our point of view, the operation of such a doctrine results in much practical injustice to innocent parties, and is repugnant to the larger public policy which should govern the states in their mutual relations. If it were to be adopted by all the states, it could hardly fail to result in a bedlam of confusion. It would become a veritable trap for the innocent victims of second marriages. Even the state of New York might well prefer to stand alone on such a doctrine than to see it adopted by all of her sister states.

The prevalent public confidence in, and reliance on, the integrity of judicial decrees is a state of the popular mind greatly to be desired, and likewise to be justified by events. If the legitimacy of a child born in lawful wedlock in one state is to be annulled in another state on abstruse grounds, the lay

public can but stand aghast. Laymen cannot be learned in those refinements of jurisdiction upon which judges stubbornly disagree. Betrothals are not attended with legal advice, or with a search of comparative legislation in other states. A repudiation by the courts of one state of the decrees entered in another on a subject which so permeates the domestic life and the status of innocent persons must ultimately result in a new and exceptional status,—that of the half-divorced and half-bigamous, and that of contingent legitimacy. A child of the new status could maintain his legitimacy only so long as he remained within the confines of one state.

Such a situation is one to be deplored, and, if possible, to be avoided; and the ingenuity of judicial interpretation and of legal logic were better directed to that end than to the contrary. So far as the personal and property rights of the defendant spouse, as distinguished from her status, are concerned, courts of equity are not wanting either in power or ingenuity to fully protect them within their territorial jurisdiction, notwithstanding the dissolution of the marriage status by a foreign decree. Remedy being adequate at this point, the reason for the New York doctrine is not very compelling.

The leading New York cases on this subject, which are still adhered to, are the following: *Mix v. Mix,* 1 Johns. Ch. (N. Y.) 204; *Bradshaw v. Heath,* 13 Wend. (N. Y.) 407; *Vischer v. Vischer,* 12 Barb. (N. Y.) 640.

Since the pronouncement in the *Haddock* case, we have followed our former precedents, in obedience to the spirit of the Constitution, as we conceive it, and have given "full faith and credit" to foreign decrees of divorce which have been entered pursuant to adequate procedure *in rem. Brett v. Brett,* 191 Iowa 262; *Holdorf v. Holdorf,* 198 Iowa 158; *McCoy v. McCoy,* 191 Iowa 973.

This declaration of comity is not to be construed as an offer of cover or condonation to any form of fraud or bad faith in acquiring a pretended domicile in a state where in truth no domicile is acquired. We recognize that a good-faith domicile of one of the parties to the marriage is a *sine qua non* of jurisdiction, without which the decree cannot be valid, even in the state where entered. But we extend to such decree, good on its

face, a presumption of validity; and the burden of attack must be upon him who denies the same.

The policy of comity herein declared implies the reciprocal obligation of every state, through its divorce courts, to require satisfactory proof of the bona-fide domicile of the complainant within its jurisdiction, and to refuse to entertain jurisdiction in any divorce case in the absence of such proof. This is the proper place of emphasis; the strategic point at which the evil of "easy" divorce can be successfully checked, without working calamity to innocent persons. For one court to decree, and another co-ordinate court to repudiate, is a species of anarchy, so far as innocent persons are concerned.

In the case at bar, the decree being wholly *in rem*, the trial court was not precluded from adjusting the property rights of the appellant. The court did allow her several hundred dollars, in the form of monthly installments, treated as accruing for two years after the dissolution of the marriage. In view of the financial condition of the parties, respectively, it was a sufficient recognition of the appellant's property rights.

3. DIVORCE: foreign decree: effect on property rights.

III. We do not overlook that the plaintiff challenged the foreign decree of divorce as having been obtained by fraud; but no evidence was offered in support of the charge. The decree is in all respects legal upon its face, and was granted pursuant to procedure that is consistent with our own laws on the same subject.

The decree is, accordingly,—*Affirmed.*

FAVILLE, C. J., and STEVENS, DE GRAFF, VERMILION, ALBERT, and MORLING, JJ., concur.